





U.S. Department of Justice

*United States Attorney*
*District of Maryland*
*Northern Division*

*Rod J. Rosenstein*
*United States Attorney*

*James G. Warwick*
*Assistant United States Attorney*

*36 South Charles Street*
*Fourth Floor*
*Baltimore, Maryland 21201*

*DIRECT: 410-209-4860*
*MAIN: 410-209-4800*
*FAX: 410-962-3124*
*TTY/TDD: 410-962-4462*

*James.Warwick@usdoj.gov*

January 7, 2015

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2015 JAN -7 PM 1:05
CLERK'S OFFICE
AT BALTIMORE
BY________DEPUTY

C. Justin Brown, Esquire
Law Offices of C. Justin Brown
231 East Baltimore Street
Suite 1102
Baltimore, Maryland 21202

Re: United States v. Robert Harrison
Criminal No. CCB-14-0170

Dear Mr. Brown:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). This plea is tendered pursuant to Rule 11(c)(1)(C). The agreed sentence is ~~five~~ 57 months years on Count One of the pending Indictment. If the Defendant accepts this offer, please have him execute it in the spaces provided below. The terms of the agreement are as follows:

JGW CJB RH

## Offenses of Conviction

1. The Defendant agrees to plead guilty to Count One of the Indictment now pending against him, which charges him with Conspiracy to Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire (18 U.S.C. § 1958). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

## Elements of the Offense

2. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

Count One: Conspiracy to Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire (18 U.S.C. § 1958)

a. The Defendant conspired and agreed with at least one other person to commit a murder in violation of the laws of any State or the United States;

b. That the murder would be committed as consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value; and

c. The defendant did use interstate commerce facilities, including cellular phones, in furtherance of the intended murder.

Penalties

3. The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty is as follows: Count One-- ten years imprisonment, a $250,000 fine and supervised release of not more than three years. In addition, the Defendant must pay $300.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

Waiver of Rights

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6. (a) This Office and the Defendant understand, agree and stipulate to the following Statement of Facts which this Office would prove beyond reasonable doubt, and to the following applicable sentencing guidelines factors:

On January 27, 2014, CW1 called Derrick Smith to discuss Smith's willingness to take a 'murder contract.' Smith responded, "I'll get on top of that shit for real, you already know…that shit ain't really…a big deal." CW1 stated, "A got a couple dollars for you, and I got like two nice watches you can have." The words 'a couple dollars' and 'two nice watches' referred to cash and watches that would be given to Smith as payment for the murder. CW1 explained to Smith that he would have a girl (undercover officer) meet him to provide him with a phone and some money to pursue the murder-for-hire. CW1 explained that providing a phone was normal to help coordinate the murder contract as it is a safer method as the phone is not subscribed to them. The understood fee for a contract killing is $5,000 in Baltimore.

On January 31, 2014, CW1 placed a call to Derrick Smith in order to coordinate the details of the murder-for-hire. A review of the call revealed that Smith again acknowledged that he would take the murder contract but he also stated, "I got two…little goons for real, for real." Smith's statement about "two goons" was a reference to the use by Smith of two other individuals to help him on the murder-for-hire.

On February 4, 2014, an undercover officer (UC) of the Baltimore Police Department met with Smith at the intersection of Whitelock Street and McCulloh Street. Audio and video recordings of this meeting were made. During this meeting, Smith accepted a $500 advance on the payment ($5,000 total) for the murder and a cellular telephone to further coordinate with the UC for the murder the UC sought to have committed. The murder was scheduled to take place on Thursday, February 6, 2014. The UC and CW1 provided Smith with the fictitious street name of the intended murder target as 'Black.'

On February 6, 2014, the UC placed a call to the phone previously provided by the UC to Smith. An unknown male (UM) answered the phone identifying himself as Smith's "homeboy." The UM explained that he would call Smith and let him know that the UC was trying to get a hold of him. Thereafter, the UC received a call from Smith on telephone 240-625-4232. The UC explained that she was on the Jersey Turnpike and would be in the Security Boulevard area of Baltimore County by early afternoon. Smith instructed the UC to contact him once the UC

got to Baltimore. The UC then received a call from the same UM from telephone 443-803-6749. This phone had previously been given by the UC to Smith to facilitate communications for the murder. The UM explained that he was outside of Smith's residence and that he would have him call the UC. A check of the court authorized geo-positioning data for that phone indicated that the phone was located in front of 934 N. Rosedale Street, Baltimore, Maryland (the residence of Smith). Later that day Smith instructed the UC to go about her business because he was still trying to find his accomplice. The murder did not take place as planned.

On February 7, 2014, CW1 placed a call to Derrick Smith to find out why Smith did not meet with the UC the previous day and kill the intended victim, 'Black." Smith explained that, "I ain't dealin' with the same nigger that I was dealin' with though." Smith explained that if it did not have to get done that day and the UC could provide him with the target's house he would have done it himself. Smith went on to say, "It wasn't ah…, ah, really like a big problem. It was like a safety issue for real-for real. …, it's where we was at…, you get what I'm sayin?" SMITH expressed his concern over the location of the murder and emphasized his desire to have it in the city rather than in Baltimore County and stated, "That shit wouldn't have been no big deal. You feel what I'm sayin'? It's not really a big deal…"

On March 11, 2014, CW1 placed a call to Smith at 443-301-9063. During this conversation Smith indicated that the unknown individuals he planned to use for this murder are afraid "they ain't gonna get paid."

On March 25, 2014, the UC placed a call to Smith at 443-301-9063. In this call the UC explained that she was going to be in Baltimore on Thursday (3/27/2014) and that she would be meeting with the intended victim, "Black." Smith instructed the UC to have CW1 call him before Thursday as he was concerned about his co-conspirators getting paid. He explained that, "I ain't really dealin' with the same little dudes that I was dealin' with…so the little dudes be wantin' some paper (a reference to money) but they don't like…they be thinkin' I'ma beat'em."

On March 25, 2014, CW1 spoke with Smith at 443-301-9063. Smith told CW1 that, "You just gotta give 'em a few dollars…I'm a make sure it get done." Smith explained that he would find his partner and call CW1 back in a minute. Smith explained that, "I'm down here now. I'm ready see where he going at." A check of the court authorized pen registered confirmed that Smith immediately called telephone number 443-803-6749. This telephone number is the telephone that the UC provided Smith on February 4, 2014. Smith later explained that he provided this phone to his partner to facilitate this murder. A check of the court authorized geo-positioning data revealed that both Smith's phone and the phone provided by the UC (later found to be in the possession of Robert Harrison) were both in the vicinity of Druid Hill Avenue and Whitelock Street. Smith called CW1 back a few minutes later and put a male on the phone. It was Robert Harrison, Jr. Harrison explained that he wanted, "half up front."

On March 27, 2013, the UC called Smith at 443-301-9063. The UC instructed Smith to meet her at the Motel 6 (1401 Bloomsfield Avenue) near the Loafers on Caton Avenue. The UC told Smith that she had "them things" (guns) and "the half" ($2,500 or half of the total payment of $5,000) which CW1 had promised to get for Smith in advance of the murder. Smith

clarified the location of Loafers Bar and Grill with the UC. Smith, who was at his girlfriend's residence at 3414 Carlisle Street, was seen walking out of the residence by an FBI surveillance team. Smith took an unlicensed taxi to 3805 Chatham Road, the residence of Robert Harrison. Smith left Harrison's residence and traveled to the vicinity of Druid Hill Avenue and North Avenue. From there Smith took a different unlicensed taxi to the Motel 6. Smith entered the motel room, which was under audio and video surveillance. The UC presented a shoebox to Smith on the bed and opened the box to reveal two loaded .9 mm semi-automatic handguns. Smith acknowledged the guns and then was given $2,500 by the UC. While counting the money, Smith asked the UC when she was going to "call the dude" to set the stage for the murder of "Black" later that night. After taking possession of the guns and the money, Smith was placed under arrest.

Harrison was arrested at 3805 Chatham Road, where the cellular phone given by the undercover to Smith was recovered.

The aforementioned conduct constitutes the crime of Conspiracy to Use of Interstate Commerce Facilities in the Commission of Murder-for-Hire (18 U.S.C. § 1958). U.S.S.G. Section 2E1.4 establishes a base offense level of 32. The Criminal History Category is III, as determined by a Pre-Pleading investigation completed by United States Probation.

(b) The United States does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for her criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. The net offense level is 29. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. The Advisory Guideline range is from 108 to 135 months (Level 29 at III). However, the maximum sentence which can be imposed on Count One is 120 months.

RH 57 months JHW CJB

**(c) The parties stipulate and agree pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C) that a total sentence of ~~five years~~ (~~60~~ months) imprisonment on Count One is the appropriate disposition of this case. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of supervised release. In the event that the Court rejects this plea agreement, *either* party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5).**

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8. This Office and the Defendant agree that with respect to the calculation the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute. The Defendant may raise factors contained in 18 U.S.C. §3553(a) in mitigation of sentence.

Obligations of the United States Attorney's Office

9. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

10. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a) The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b) The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed, including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release. Nothing in this agreement shall be construed to prevent either the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), and appealing from any decision thereunder, should a sentence be imposed that is illegal or that exceeds the statutory maximum allowed under the law or that is less than any applicable statutory mandatory minimum provision. The Defendant waives any and all rights under the Freedom of

Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Obstruction or Other Violations of Law

12. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

Court Not a Party

13. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

14. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,
Rod J. Rosenstein
United States Attorney

By: James G. Warwick
James G. Warwick
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

1/7/15
Date

Robert Harrison
Robert Harrison

I am Mr. Harrison's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

1/7/15
Date

C. Justin Brown, Esq.